ARNOLD LEVY v. UNITED STATES [1]

United States Customs Court, Third Division

(Decided September 14, 1938)

Plaintiff not represented by counsel.

*Charles D. Lawrence*, Acting Assistant Attorney General (*Daniel I. Auster* and *Richard F. Weeks*, special attorneys), for the defendant.

[1] C. D. 33.

Before CLINE, EVANS, and KEEFE, Judges; EVANS, J., not participating

CLINE, Judge: In this suit against the United States the plaintiff claims that the collector of customs at the port of Tampa, Fla., erroneously assessed duty on certain muzzle-loading fire arms at the rate of $2 each, $2.50 each and $3.50 each, respectively, depending upon the value thereof, and in addition thereto at 55 per centum ad valorem on all of the items under the provision for pistols in paragraph 366 of the Tariff Act of 1930.

It is claimed in the protest that the firearms should have been returned free of duty under paragraph 1723 or paragraph 1811, or dutiable at 40 per centum ad valorem under paragraph 397. Claim is made also that an allowance should be made for shortage of parts of some of the other items covered by the shipment.

The entry was made at the port of Miami, Fla., and the case was called for trial at that port. The plaintiff, who was the only witness, testified that he is in the antique business in Miami and that his claim as to the classification of the guns was limited to paragraph 1723. The claim under paragraph 1811 was abandoned and no evidence was introduced in support of the claim under paragraph 397. Paragraphs 366 and 1723 read as follows:

PAR. 366. Pistols and revolvers: Automatic, single-shot, magazine, or revolving, valued at not more than $4 each, $2 each; valued at more than $4 and not more than $8 each, $2.50 each; valued at more than $8 each, $3.50 each; parts thereof and fittings therefor, 50 per centum ad valorem; and in addition thereto, on all the foregoing, 55 per centum ad valorem.

PAR. 1723. Muzzle-loading muskets, shotguns, rifles, and parts thereof. [Free of duty.]

The plaintiff produced seven guns out of the twenty-two in the item invoiced as lot 57 on the invoice, and additional samples from some of the other items, but only two samples from lot 57 were introduced in evidence. They were marked "Exhibit 1" and "Exhibit 2." There are eleven items of guns covered by the invoice, described as follows:

| | |
|---|---|
| 13 4 Muzzleload guns | 57 22 Muzzle loading guns |
| 23 2 Muzzleload guns in box | 60 2 Muzzle load guns |
| 38 1 Muzzle load gun | 69 1 Muzzle load gun |
| 42 1 Pr. Muzzleload guns | 75 8 Muzzle loading guns |
| 51 6 Muzzle loading guns | 80 2 Muzzle loading guns |
| 54 4 Muzzle loading guns | |

The plaintiff testified that of the twenty-two guns in lot 57, eighteen were like Exhibit 1 and four like Exhibit 2. He stated that all the other guns were similar but did not explain which items covered those like Exhibit 1 and which covered those like Exhibit 2. He testified further that all of the guns were intended to be loaded with powder and wadding and a ball rammed from the muzzle end. When asked

by the judge presiding at the trial if the exhibits were muskets or shotguns, he answered, "I would classify it as a gun."

When asked on cross-examination as to his qualifications to identify the type of guns covered by the shipment, he stated that he had been in the antique business for twenty-two years; that he had not attended school for the purpose of studying guns but had read books along that line, visited museums, etc. When asked to explain the difference between a pistol and a revolver, he said that "a pistol can be put to a stop for firing, whereas a revolver cannot be. The revolving is automatic." The following testimony further illustrates his familiarity with the subject of firearms:

X Q. These large objects which you have here (referring to Exhibit 1) of which you produced four, what do you call them?—A. Muzzle-loading guns.

X Q. Would you call them muzzle-loading muskets?—A. Well, that is a technical term.

X Q. Would you call them muzzle-loading muskets?—A. Well, I wouldn't call these muskets; I would call them guns or rifles.

X Q. Would you call them shot guns?—A. They are shot guns.

X Q. What kind of shot guns?—A. Muzzle-loading shot guns.

X Q. Would you call them rifles?—A. I would call them rifles.

X Q What kind of rifles?—A. Muzzle-loading rifles.

X Q. Would you call them muzzle-loading pistols?—A. I would not.

X Q. Would you call them muzzle-loading revolvers?—A. No, sir.

When interrogated as to the smaller gun (Exhibit 2), he testified as follows:

Judge KEEFE. What do you call these?

The WITNESS. These are muzzle-loading guns.

X Q. Would you call that a pistol?—A. No.

X Q. Would you call it a double-barreled pistol?—A. No, sir. I would call that a muzzle-loading gun. It looks more like a cannon.

X Q. This is a single shot. Is that also a muzzle-loading gun?—A. Yes.

X Q. Would you call it a muzzle-loading pistol?—A. No.

X Q. Would you call it a pistol at all?—A. I would not.

Exhibit 1 is a gun about four feet three inches in length, having a barrel about 36½ inches long. A metal ram rod 34¼ inches in length fits into a hole in the wooden portion to which the barrel is attached. The bore in the barrel is slightly over one-half inch in diameter and appears to be smooth and not spirally grooved as in a rifle. The gun has a peculiar firing mechanism which appears to be like the illustration of the flint-lock firing mechanism shown in Webster's New International Dictionary.

Exhibit 2 consists of a double-barreled gun about 15½ inches in length. The barrels are about 8¼ inches long and one ram rod of the same length is attached. The bore in the barrels of this exhibit is slightly over one-half inch in diameter and appears to be smooth and not spirally grooved. The gun has two triggers and two firing mechanisms of the flint-lock type.

The lexicographers describe the various types of guns provided for in paragraphs 366 and 1723 as follows:

*Pistol.* A firearm intended to be held in one hand when fired. It came into use early in the sixteenth century, perhaps as early as 1500, for by 1520 it was common as a weapon of the reiters or German mercenary cavalry, who were called pistoleers from its use. The early pistol was fitted with a wheel-lock, which was superseded by the flint-lock and the latter by the percussion-lock. Pistols with more than one barrel have been in use from the introduction of the weapon, those with two having the barrels sometimes side by side, sometimes one over the other. The stock of the pistol has been made of many forms, the old cavalry pistol having it only slightly curved, so that it was held, when pointed at an object, by the right hand with the lock uppermost, the barrel to the left, the trigger to the right. When accurate aiming was required, as in dueling-pistols, the handle was made much more curved. [*Century Dictionary.*]

*Revolver.* 1. One that revolves; specif.; A firearm (commonly a pistol) with a cylinder of several chambers or, formerly, several barrels so arranged as to revolve on an axis, and be discharged in succession by the same lock. [*Webster's New International Dictionary.*]

*Musket.* 2. A hand firearm formerly carried by soldiers, esp. the infantry of an army. It was originally fired by means of a match, or matchlock, for which several mechanical appliances (including the wheel lock, the flintlock, and finally the percussion lock) were successively substituted. The earliest muskets were extremely heavy and clumsy, smoothbore, and of large caliber. As successive improvements were made they increased in lightness and ease of handling as well as in range, penetration, and accuracy. Rifling was applied to muskets early in the 19th century, and their development into the modern rifle was then steady, though gradual. [*Webster's New International Dictionary.*]

*Shotgun.* A smooth-bore gun, often double-barreled, and now almost universally breech-loading, designed for firing shot at short range, and killing small game, esp. birds. [*Webster's New International Dictionary.*]

*Rifle.* A firearm, of whatever size, having upon the surface of its bore spiral grooves, called rifling, to impart rotary motion to the projectile, insuring greater accuracy of fire. *Specif:* a. In popular use, such a firearm fired from the shoulder, in distinction from artillery and from pistols or revolvers, as well as from smooth-bore shotguns. b. In military use, such a firearm fired from the shoulder and distinguished from a carbine by greater length and weight and by provision for a bayonet. It is the successor of the musket as a military arm. All modern firearms using single projectiles are rifled, varying in the pitch of the spiral, the relative width of grooves and lands, etc. [*Webster's New International Dictionary.*]

It is obvious from a comparison of Exhibit 1, with the definitions above quoted, that the article is neither a pistol nor a revolver. It is not intended to be held in one hand when fired. The collector's classification thereof under the provision for pistols or revolvers is therefore erroneous. The witness stated that it was a rifle and a shotgun, but inasmuch as the bore does not contain spiral grooves, called rifling, such as is contained in a rifle, and the witness testified that it is intended to be used in firing a single molded shot or bullet which is rammed into the muzzle of the gun, the exhibit does not come within the definition of either a rifle or a shotgun.

Exhibit 1 responds to the definition of the word "musket", above quoted. In the case of *A. A. Vantine & Co.* v. *United States*, T. D. 13212, similar firearms were held dutiable under the provision for "muskets" in paragraph 169 of the Tariff Act of 1890. The common meaning of a term used in the statute, having been once settled and judicially determined, becomes a matter of law and continues until changed by language in a subsequent statute, citing *United States* v. *Ben Felsenthal & Co.*, 16 Ct. Cust. Appls. 15, T. D. 42713; *United States* v. *North American Mercantile Co.*, 17 C. C. P. A. 378, T. D. 43820. Testimony as to the common meaning of words may be received, but the court is not bound by such evidence, citing *United States* v. *North American Mercantile Co.*, *supra*. Therefore the court may disregard the statement of plaintiff that Exhibit 1 is not a musket.

We find from an inspection of Exhibit 1 that the items represented thereby are muskets. The testimony shows that there were eighteen guns like Exhibit 1 in the lot invoiced as item 57, there being twenty-two guns in that lot. We hold that eighteen of the twenty-two guns in item 57 are free of duty as muzzle-loading muskets under paragraph 1723.

The issue as to Exhibit 2 is quite different. That exhibit responds to the definition of the word "pistol", above quoted, as it is a firearm intended to be held in one hand when fired. Muzzle-loading pistols are not provided for in paragraph 1723, under which plaintiff claims, citing *Wm. Read & Sons* v. *United States*, T. D. 24621. In that case certain antique horse pistols were held dutiable as side arms, under paragraph 154 of the Tariff Act of 1897, although they were not serviceable for use. The provision for "pistols" in that act covered only revolving pistols, but the provision for "pistols" in paragraph 366 of the Tariff Act of 1930 includes "single-shot" pistols. Although Exhibit 2 has double barrels, it is single shot; therefore the collector's classification is correct.

As to the claim of shortage, it is stated in the protest that items 8, 402, and 538, amounting to £21 10s. 0d., were short. The total value of those items is £21 20s. 0d. There is a notation on a slip of paper attached to the invoice that allowance for the shortage of item 8, amounting to 5 shillings, was made in liquidation and the plaintiff abandoned his claim thereto at the trial. The importer evidently stated the total value of the enumerated items in his protest, with a deduction of 5 shillings which was allowed in liquidation for item 8.

The plaintiff proved at the trial that parts of a pair of lamps were missing when the goods were received. Counsel for defendant admitted that they were missing but stated that, in view of the fact that the missing parts could be imported subsequently, no allowance was made. The appraiser's notation on the invoice opposite the two

lamps invoiced as item 538 is as follows: "Sections & rods of both lamps short. Useless without these parts."

The plaintiff testified also that a brass piece to hold up the glass ball was missing from a lamp invoiced as item 402 and that, without the brass part, the lamp was useless and he threw it away in the presence of the examiner. The following notation appears on the invoice opposite that item: "Part base missing—Destroyed."

Section 499 of the Tariff Act of 1930 contains the following provision:

SEC. 499. * * * If a deficiency is found in quantity, weight, or measure in the examination of any package, report thereof shall be made to the collector, who shall make allowance therefor in the liquidation of duties.

The collector seems to have ignored the above provision in computing the duty on items 402 and 538. He should have made allowance for the shortage noted by the appraiser. The reason suggested by counsel for the defendant that the importer could subsequently import the missing parts is no reason for ignoring the statute. We find that there was a nonimportation of the parts of items 402 and 538 which were shown by the notations on the invoice not to have been imported, and hold that duty should not be assessed on the missing parts, citing *Thomson & Taylor Co.* v. *United States*, T. D. 47335.

As to the eighteen of twenty-two guns covered by invoice item 57, and as to the shortage noted on the invoice opposite items 402 and 538, the protest is sustained and the collector of customs is directed to refund the duty collected on said merchandise. Judgment to that extent will be entered in favor of the plaintiff.

As to all other merchandise and in all other respects, the protest is overruled.